BRUCE M. SMITH, ISB #3425
MOORE SMITH BUXTON & TURCKE, CHARTERED
Attorneys at Law
225 North 9th Street, Suite 420
Boise, ID 83702
Telephone: (208) 331-1800
Facsimile: (208) 331-1202

PHILIP H. GORDON, ISB # 1996
GORDON LAW OFFICE
623 W. Hays Street
Boise, ID 83702-5512
Telephone: (208) 345-7100
Facsimile: (208) 345-0050

REX BLACKBURN, ISB #3170
BRUCE C. JONES, ISB #3177
DANIEL LORAS GLYNN, ISB #5113
BLACKBURN & JONES LLP
1673 W. Shoreline Dr., Ste. 200
Boise, ID 83702
Telephone: (208) 489-8989
Facsimile: (208) 489-8988

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT AND RENAE BAFUS, as a married couple, and as Individuals and Members and Representatives of the Class of Similarly Situated Persons; CURTIS AND GWENDOLYN BLOUGH, as a married couple, and as Individuals and Members and Representatives of the Class of Similarly Situated Persons; GARY AND SHAWNA YASUDA, as a married couple, and as Individuals and Members and Representatives of the Class of Similarly Situated Persons, and DAVE AND EMILY MERRITHEW, as a married couple, and as Individuals and a | Civil No. 04-121-C-BLW **SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL PURSUANT TO FED. R. CIV. P. 38(b)** |

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 1

Members and Representatives of the Class of
Similarly Situated Persons.

       Plaintiffs,

vs.

ASPEN REALTY, INC., dba Coldwell Banker
Aspen Realty, HOLLAND REALTY, INC.,
PARK POINTE REALTY, INC. d/b/a JOHN L.
SCOTT REAL ESTATE, SEL-EQUITY
COMPANY d/b/a SEL-EQUITY REAL
ESTATE and SEL-EQUITY REALTY, and
JOHN AND JANE DOES 1-50

       Defendants.

COME NOW the Plaintiffs, on behalf of themselves and any and all persons and entities

similarly situated, and for their cause of action, allege as follows:

## I.
## INTRODUCTION

1.     This Complaint, which sets forth claims for damages and injunctive relief, is

brought pursuant to F.R.C.P. 23 by Renae and Robert Bafus, Dave and Emily Merrithew, Curtis

and Gwendolyn Blough, and Gary and Shawna Yasuda, as individuals and as representatives of a

class of injured Plaintiffs who bought or attempted to buy lots and/or homes in various

subdivisions in the Treasure Valley Idaho area. The Defendants, Aspen Realty, Inc., dba

Coldwell Banker Aspen Realty ("Coldwell Banker Aspen Realty"), Holland Realty, Inc.

("Holland Realty"), Park Pointe Real Estate d/b/a John L. Scott Real Estate ("John L. Scott"),

and Sel-Equity Company dba as SelEquity Real Estate ("Sel-Equity") have, by their actions in

marketing, offering, and providing real estate broker services for the sale of lots and homes in

the various subdivisions, violated the antitrust and other laws of the United States and the State

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 2

of Idaho as set forth below. The Plaintiffs seek a declaratory judgment, ordering and adjudging that the Defendants violated the antitrust, unfair trade, and other laws of the United States and the State of Idaho and granting injunctive relief prohibiting Defendants from engaging in similar future conduct. The Plaintiffs also seek treble damages, including a refund of the commissions they were unlawfully charged, together with interest at the statutory rate, and their attorney fees and costs, disgorgement of all profits unlawfully made, and other damages as established at trial.

## II.
## JURISDICTION

2.    Jurisdiction is conferred by means of 15 U.S.C. § 1, 2 et seq. (Sherman Antitrust Act), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337(a) (commerce and antitrust clause), 15 U.S.C. § 22 (injunctive relief), 15 U.S.C. § 15 (private antitrust treble damages), 28 U.S.C. § 2201 et seq. (Declaratory Judgment Act), and 28 U.S.C. § 1367 (supplemental jurisdiction) and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2600 et seq.

## III.
## VENUE

3.    Venue is proper because a substantial part of the events giving rise to the Plaintiffs' claims occurred here and the property itself is situated here.  28 U.S.C. § 1391.

## IV.
## PARTIES

4.    Robert and Renae Bafus are residents of the State of Idaho.

5.    Curtis and Gwendolyn Blough are residents of the State of Idaho.

6.    Gary and Shawna Yasuda are residents of the State of Idaho.

7.    Dave and Emily Merrithew are residents of the State of Idaho.

8.     Aspen Realty, Inc. is an Idaho corporation formed in 1980. It operates under the name of Coldwell Banker Aspen Realty. It does business in Idaho and nationally as a real estate brokerage. Lawrence C. Laraway is, upon information and belief, the sole stockholder.

9.     Holland Realty is an Idaho corporation formed in 1984. It does business in Idaho and nationally as a real estate brokerage. John W. Holland is, upon information and belief, the sole stockholder.

10.    Park Pointe Realty, Inc. is an Idaho corporation formed in 1986. It does business in Idaho and nationally as a real estate brokerage. It operates under the name of John L. Scott Real Estate. Park Pointe Management Services, Inc., another Idaho corporation is, upon information and belief, the sole stockholder of Park Pointe Realty, Inc. R. Craig Groves and Robert R. Bass are, upon information and belief, the sole stockholders of Park Pointe Management Services, Inc. and control the operations of Park Pointe Realty Inc.

11.    Sel-Equity Company is an Idaho corporation formed in 2003. It operates under the assumed business names of Sel-Equity Real Estate and Sel-Equity Realty. It does business in Idaho and nationally as a real estate brokerage. Upon information and belief, Kristen Van Engelen is the sole stockholder.

12.    John and Jane Does 1-50 are unknown parties who, upon information and belief, participated in the activities identified in the Complaint. These entities and/or persons will be identified through discovery.

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 4

## V.
## FACTUAL BACKGROUND

### FACTS RELATED TO PLAINTIFFS ROBERT AND RENAE BAFUS

13.     In March 2000, Robert and Renae Bafus were looking for a lot on which to build a home. The Bafuses had selected a contractor, Brandon Walker, d/b/a Walker Building Inc., to build their home when they found a lot.

14.     The Bafuses went to the Chaumont Subdivision in Eagle, Idaho, after seeing an advertisement for it in the *Idaho Statesman Real Estate Magazine* for March 4-10, 2000. The advertisement indicated the subdivision was open to any builder.

15.     The Bafuses picked out a lot and, observing a realtor's sign at the lot, contacted Joe Rotta, an agent of the listing broker Coldwell Banker Aspen Realty for the Chaumont Subdivision.

16.     Meeting with Rotta, the Bafuses negotiated a price of thirty-four thousand dollars ($34,000.00) for the lot instead of the asking price of thirty-six thousand dollars ($36,000.00). Rotta drafted a Real Estate Purchase and Sale Agreement (REPSA) listing the Bafuses as Buyer and Walker Building as Seller. The Bafuses eventually signed the REPSA. However, the agreement drafted by Coldwell Banker Aspen Realty listed a price of one hundred and fifty-one thousand dollars ($151,000.00), instead of the thirty-four thousand dollars ($34,000.00) for the lot. The one hundred and fifty-one thousand dollars ($151,000.00) reflected the cost of the lot plus the cost of the house to be built by Walker.

17.     Unsure of the way the lot purchase was being addressed in the REPSA and because the Bafuses wanted their own buyer's agent, they contacted Stan Thomas, another Coldwell Banker Aspen Realty agent, who had independently been helping them search for an

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 5

existing house. Although the Bafuses thought Thomas represented them, in fact, the agreement

they had signed, called an "Exclusive Buyer Representation Agreement," allowed Thomas and

Coldwell Banker Aspen Realty to act as a dual agent representing sellers at the same time they

represented the Bafuses.

18.     The Bafuses were confused about the commission to be paid because the REPSA

had included the one hundred and fifty-one thousand dollars ($151,000.00) cost of the lot and

house. Coldwell Banker Aspen Realty agent Thomas told the Bafuses they could not buy just

the lot, that the commission of six percent (6%) was not negotiable, and that the commission had

to be based on the cost of the lot and house together. Although relying upon Coldwell Banker's

advice, the Bafuses remained confused about the REPSA, but told Thomas the commission

should be based on the cost of the lot alone. This was because the Bafuses did not want or need

the services of Coldwell Banker Aspen Realty for construction of the house in that the Bafuses

had independently secured their own builder, worked with their own architect, and developed

their own plans.

19.     Coldwell Banker Aspen Realty, despite being an agent for the Bafuses, refused to

submit an offer for the lot alone and told the Bafuses they could not do so.

20.     As a result of the actions of Coldwell Banker Aspen Realty, the Bafuses'

purchase included a six percent (6%) Buyer's broker fee based on the one hundred and fifty-one

thousand dollar ($151,000.00) cost of the lot and the house. The commission on the lot should

have been two thousand and forty dollars ($2,040.00) while the actual commission was nine

thousand and sixty dollars ($9,060.00). The Bafuses were thus required to pay seven thousand

twenty dollars ($7,020.00) extra in commissions and purchase a house at an inflated cost. The

inflated cost of the house also resulted in additional damages by increasing the costs of items such as taxes, loan origination fees, insurance, and other cost-based items.

21.    Because the Bafuses did not want to use the services of Coldwell Banker Aspen Realty on matters related to the construction of the house, and were upset over the amount of the commission being demanded, the Bafuses sought to determine why the commission was based on the one hundred and fifty-one thousand dollar ($151,000.00) cost of the lot plus the house. The Bafuses learned:

(A) Coldwell Banker Aspen Realty acting alone, or in concert with others, had established itself as the exclusive listing agent and controlled the market for sale of undeveloped lots in the Chaumont subdivision.

(B) Coldwell Banker Aspen Realty, acting alone or in concert with others, allowed only a limited number of certain builders to build in Chaumont.

(C) Coldwell Banker Aspen Realty, acting alone or in concert with others, would not allow the sale of individual lots, with a corresponding commission, but required the parties involved to pay a commission based on the cost of the lot and the house together.

(D) Coldwell Banker Aspen Realty, acting alone or in concert with others, would allow builders to build in the subdivision only if the builders agreed to include a six percent (6%) commission based on the price of the developed lot as opposed to just the price of the undeveloped lot.

(E) Coldwell Banker Aspen Realty had drafted the REPSA listing Walker Building as the "Seller" even though Coldwell Banker Aspen Realty knew that Walker Building did not own the lot.

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL PURSUANT TO FED. R. CIV. P. 38(b) – 7

22.     Coldwell Banker Aspen Realty advertises and offers its services to both in-state and out- of-state clients. Thus, Coldwell Banker Aspen Realty advertisements and its work as a brokerage have a substantial effect on interstate commerce, and its activities as a real estate broker are themselves part of interstate commerce.

23.     In the Bafus transaction, Coldwell Banker Aspen Realty provided services to the Bafuses in regard to the purchase of their lot, and the Bafuses were prepared to pay Coldwell Banker Aspen Realty for such services. However, Coldwell Banker Aspen Realty, through its control of the sale of lots in the subdivision, required the Bafuses to also pay for their services with regard to the construction of the house, even though the Bafuses had indicated they did not want or need such services, and did not want to pay a commission on such services. The Bafuses were required to pay for such services in order to buy their lot.

24.     In the course of representing the Bafuses and in its marketing efforts and other services as described above in Chaumont Subdivision, Coldwell Banker Aspen Realty fraudulently misrepresented and/or concealed its actions: (1) with regard to the REPSA, (2) the Exclusive Buyer Representation Agreement, (3) by not allowing buyers to buy undeveloped lots without also having to pay for the services of Coldwell Banker Aspen Realty for the development of the lot, and (4) by charging commissions which were unfair, unreasonable, and artificially inflated the prices of houses in the Chaumont Subdivision. Coldwell Banker Aspen Realty also breached its duty to accurately inform the Bafuses of Aspen Realty's conflict of interest while acting as their agent.

25.     Upon information and belief, Coldwell Banker Aspen Realty engages in similar conduct as described above in other subdivisions.

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 8

26.     The actions of Coldwell Banker-Aspen Realty, Inc., including the act of charging commissions on the build out price of houses to be built on undeveloped lots, is a common practice mirrored throughout the Boise area by other brokerage houses doing business in the area, including, Holland Realty, John L. Scott, and SelEquity.

27.     In particular, John L. Scott regularly and routinely engages in the practice of charging commissions based on the cost of the house to be built on an undeveloped lot as a condition of buying the lot.

28.     In particular, Holland Realty regularly and routinely engages in the practice of charging commissions based on the cost of the house to be built on an undeveloped lot as a condition of buying the lot.

29.     In particular, Sel-Equity regularly and routinely engages in the practice of charging commissions based on the cost of the house to be built on an undeveloped lot as a condition of buying the lot.

### FACTS RELATED TO PLAINTIFFS CURTIS AND GWENDOLYN BLOUGH

30.     In the fall of 2003, Curtis and Gwendolyn Blough contacted Tim Wagnon of Trademark Homes regarding their interest in having Trademark Homes construct a home for them.

31.     Curtis Blough is an experienced contractor but upon moving to the Treasure Valley, Idaho area learned that he would not be able to act as the contractor for his own home in any subdivision exclusively listed by a real estate brokerage.

32.     Mr. Wagnon showed the Bloughs lots that he represented Trademark Homes owned within the Baldwin Park subdivision.

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 9

33.    Upon information and belief, Holland Realty is the exclusive listing agent for the sale of undeveloped lots in the Baldwin Park subdivision.

34.    The Bloughs selected Lot number 42, block number 4 within Baldwin Park because they believed it would best suit the plans for the home they intended for Trademark Homes to construct on their behalf. The lot had a sales price of thirty-seven thousand and fifty dollars ($37,050).

35.    The Bloughs were advised by Dave Kallas, of Holland Realty that the Bloughs could not buy and pay a commission on only the lot. They were instead required to purchase and pay a commission on the lot and the cost of the home to be constructed on the lot. The Bloughs were able to reduce the amount of the commission to 3% because they agreed to let Holland Realty list the house they were selling

36.    When the Bloughs questioned why they had to pay a commission on the cost of the house to be built, the Bloughs were advised to the effect that "this is just the way it is done."

37.    When disagreements developed between the Bloughs and Trademark Homes, the Bloughs requested that Holland Realty assist in resolving these disagreements. Holland Realty refused and the Bloughs were ultimately forced to act as their own contractor for the completion of the home in Baldwin Park.

38.    At closing, the Bloughs paid a commission to Holland Realty based upon the value of the lot as well as the completed home. Furthermore, the commission was based upon the contract purchase price, not the amount actually paid to Trademark. The actual amount paid to Trademark was less than the contract price because, under their agreement with Trademark, the Bloughs were able to do some of the work themselves and thereby reduce the amount to be

paid to Trademark. Thus the Bloughs were forced to pay a commission on the cost of their own work.

39.     As a result of Holland Realty's actions, the Bloughs were required to pay a three percent (3%) brokers fee based on the total cost of the lot and the house. Thus, while the commission on the lot should have been one thousand one hundred eleven dollars and fifty cents ($1111.50), the actual commission paid by the Bloughs was six thousand four hundred eighty-six and eight-one cents ($6,486.81). Thus, on closing on June 24, 2004, the Bloughs were required to pay approximately five thousand three hundred seventy-five dollars ($5375.00) extra in commission and purchase a house at an inflated cost. The inflated cost of the house also resulted in additional damages by increasing the costs of items such as taxes, loan origination fees, insurance, and other cost-based items.

FACTS RELATED TO THE PLAINTIFFS GARY AND SHAWNA YASUDA

40.     In August of 2003, Gary and Shawna Yasuda spoke with developer John Evans regarding the purchase of a lot in the Sedona Creek Subdivision, located in Eagle, Idaho. Dave Evans informed them that the Sedona Subdivision was being exclusively listed by Sel-Equity and that there were only seven builders that were authorized to construct homes in the Sedona Creek Subdivision

41.     Upon information and belief, Sel-Equity is the exclusive listing agent for the sale of undeveloped lots in the Sedona Creek subdivision.

42.     On September 15, 2003, the Yasudas selected Zach Evans Construction to build their home upon Lot 15, block number 1 within the Sedona Creek Subdivision. The lot was priced at eighty-four thousand, nine hundred dollars ($84,900).

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 11

43.   Because the Yasudas' wished to construct a shop in addition to the home, they requested that they be provided with separate bids for each structure.

44.   The bid sheets prepared by Zach Evans provided for a three percent "marketing fee" based upon the total cost of the lot, the home, and the shop.

45.   Although these amounts were represented in Zach Evans Construction's bid sheets as a "marketing fee," upon closing in January 28, 2004, these amounts were described as a real estate broker's fee.

46.   As a result of Sel-Equity's actions, the Yasudas were required to pay a three percent (3%) commission based on the total cost of the lot and the house as well as a three percent commission on the cost of the shop constructed. The commission on the lot should have been two thousand five hundred forty-seven dollars ($2,547), but the actual commission charged to the Yasudas was sixteen thousand one hundred seventy-nine dollars ($16,179). Thus, on closing on January 28, 2004, the Yasudas were required to pay approximately thirteen thousand six hundred thirty-two ($13,632) extra in commissions and purchase a house and shop at an inflated cost. The inflated cost of the house and shop also resulted in additional damages by increasing the costs of items such as taxes, loan origination fees, insurance, and other cost-based items.

### FACTS RELATED TO PLAINTIFFS DAVE AND EMILY MERRITHEW

47.   In or about August of 2002, the Merrithews determined to use Aspen Homes, Inc., to build their home. The Merrithews viewed several lots within the Bearcreek Subdivision in Meridian, Idaho.

48.   Upon information and belief, John L. Scott is the exclusive listing agent for the sale of undeveloped lots in the Bearcreek subdivision.

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 12

49.     The Merrithews decided to purchase Lot 19, block 1, Bearcreek Subdivision #2 at a purchase price of $45,000.

50.     The Merrithews were never told, nor did they understand, that they would pay a commission to John L. Scott based not only on the value of the lot but on the total cost of the lot plus the home to be constructed. Yet, when their documents were prepared by J.L. Scott, they were required to pay a commission not on the price of the lot, but on the price of the lot and the yet to be built house.

51.     As a result of John L. Scott's actions, the Merrithews were required to pay a six percent (6%) commission based on the total cost of the lot and the house. Thus, while the commission on the lot should have been two thousand seven hundred dollars ($2,700), the actual commission paid by the Merrithews was ten thousand and seventy-four dollars ($10,074.00). Thus, on closing on January 29, 2003, the Merrithews paid seven thousand three hundred thirty four dollars ($7,374.00) extra in commission and were required to purchase a house at an inflated cost. The inflated cost of the house also resulted in additional damages by increasing the costs of items such as taxes, loan origination fees, insurance, and other cost-based items.

52.     With respect to each of these transactions and others, the Defendants, acting alone or in concert with others,  as a general and routine practice, charge commissions based not on the cost of the undeveloped lot, but rather on the total cost of the undeveloped lot plus the cost of the house to-be constructed on the lot. The Defendants perform no services which are commensurate with the commissions charged, especially the commissions based on the cost of the homes to-be-constructed. The commissions on the cost of the homes to- be- constructed are charged solely by virtue of the fact that the Defendants control the sale of the undeveloped lots and refuse to allow the sale of lots unless the homebuyer also pays a commission on the cost of the house to-be-

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 13

constructed. Upon information and belief, there may be other real estate brokers who engage in similar practices.

53.     In some instances, the Defendants, acting alone or in concert with others, charge the commissions under the guise of a "marketing fee." However, the commissions are always based on the cost of the developed lot, not the lot itself. Furthermore, the Defendants performed little or no services for the commissions on the construction of the house.

54.     The Defendants and others have and use monopolistic economic control in the manner described above in each of the subdivisions where they are the exclusive listing brokerage and/or control the sale of undeveloped lots.

55.     In addition to their individual actions in the subdivisions, the Defendants combined have the power to control a sufficient amount of the market for undeveloped lots in subdivisions in the Treasure Valley, Idaho area such that they collectively exert monopolistic economic control over a substantial portion of the market for undeveloped subdivision lots in the area.

56.     In addition to their individual actions which individually affect a substantial amount of interstate commerce, the combined actions of the four brokerages have an even larger effect on interstate commerce.

## VI.
## CLASS ACTION ALLEGATIONS

57.     Plaintiffs bring this action as a class action pursuant to F.R.C.P. 23 and I.R.C.P. 23, individually and as members of the class.

58.     The class shall include, at a minimum, all persons who bought undeveloped lots in the Chaumont, Baldwin Park, Bearcreek, and Sedona Creek subdivisions reflecting the

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 14

conditions described above, had homes built on the lots, and were charged a commission based

on the cost of the lots plus the cost of the house, i.e. a commission based on the total build out

cost. The class will also include others who bought undeveloped lots in other Treasure Valley,

Idaho area subdivisions exclusively listed by the Defendants under the conditions as described

herein, those who purchased homes in the subdivisions at costs that were inflated due to the

practices of the Defendants, and possibly builders who were foreclosed from building in these

and other subdivisions due to the actions of Defendants.

59.     The class is so numerous that joinder of all members as Plaintiffs is impracticable.

The Plaintiffs allege upon information and belief that the class might consist of at least several

thousand members.

60.     The claims of the Plaintiffs are typical of the claims of the class, and the Plaintiffs

will fairly and adequately protect the interests of the class. A class action is superior to other

available methods for the fair and efficient adjudication of the controversy in that there are

numerous Plaintiffs and the individual damages of any class member would be relatively small

when measured against the potential costs of bringing the action, thus making the expense and

burden of the litigation unjustified for individual actions.

61.     There are common questions of law and fact, namely that the antitrust and other

laws of the United States and the State of Idaho apply to the Defendants with regard to each

member of the class and that the complained of conduct occurred with respect to each class

member. The named Plaintiffs do not anticipate any difficulty in the management of this suit as

a class action.

62.     The Plaintiffs will fairly and adequately protect the interests of the Class. They

have no conflicts of interest in the maintenance of the class action, and they have retained

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 15

counsel competent and experienced in class action litigation. Plaintiffs' counsel are regularly and continuously engaged in the prosecution of a large number of class action lawsuits in both state and federal courts, both in Idaho and in a significant number of other jurisdictions.

63.     The Defendants have acted on grounds which are universally applicable to the class, thereby making injunctive and declaratory relief with respect to the class as a whole appropriate.

## VII.
## APPLICABLE LAW

64.     The Sherman Antitrust Act is the nation's means of ensuring that competition is maintained, that trade and commerce are not restrained, and that the consumer gets the benefits of lower prices, better products, and more efficient production methods. Section 1 of the Act deals with the means by which competition is restrained, and Section 2 deals with the result of those actions. Coupled together, Sections 1 and 2 address almost every conceivable act prohibited by the Act.

65.     Section 1 provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000 or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

This section prohibits contracts, combinations, and conspiracies which restrain trade.

66.     Section 2 provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 16

> any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

This section prohibits monopolies and attempts to monopolize.

67.     The Act applies to real estate brokerage businesses. *U.S. v. National Association of Real Estate Bds*. 339 US 485, 70 S. Ct. 711.

68.     Idaho statutes closely mirror federal statutes with regard to the above described actions of Defendants. Specifically, Idaho Code § 48-101 et seq. is similar to the Sherman Antitrust Act, and makes illegal such monopolies, restraints of trade, unfair trade practices, and conspiracies.

69.     Under federal and state antitrust laws, tying arrangements reflect arrangements by which a party agrees to sell one product but only on the condition that the buyer also purchases a different and separate product. Tying arrangements often arise when a party has market power or monopoly power such that the party can force a buyer to buy the tied product even though the buyer wants to only buy the tying product. Tying agreements or arrangements are *per se* violations of the Sherman Antitrust Act just as are arrangements which fix prices. As applied to the foregoing facts, the tying product is the Defendants' services with regard to the control and sales of undeveloped lots. The second product, which is separate and distinct from the first, is the Defendants' services with regard to sale of developed lots. In other words, the Defendants would only allow the sale of undeveloped lots subject to the condition that the Defendants also had the exclusive right to sell and charge a commission on the developed lot. One of the results of the Defendants' tying arrangements in this case is to fix prices for housing in the subdivisions

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL PURSUANT TO FED. R. CIV. P. 38(b) – 17

at a level that reflects the Defendants' commission on the tied product. In other words, to buy a lot in a subdivision, a buyer has to pay a commission based on services for the cost of the house as well as a commission based on services for the cost of the lot. This arrangement has the effect of fixing the price of housing for buyers at a level higher than would otherwise occur.

70.     Defendants performed either no or merely nominal services for the commission related to the cost of the house.

71.     Defendants' actions further damaged Plaintiffs in that other costs that were based on the price of the home, for example taxes and insurance, were similarly inflated.

72.     There are other statutory regimes that govern and regulate the Defendants' activities as brokers. The Real Estate Settlement Procedures Act (RESPA), 12 USC 2600 et seq., which is administered by the U.S. Department of Housing and Urban Development (HUD), is designed to help protect consumers by requiring certain disclosures related to the costs of real estate settlement services. These disclosures take place at the time of loan application, before closing, at closing, and post closing. A premium is placed on full disclosure of information. In addition to disclosures, RESPA prohibits certain activities such as kickbacks, certain types of fee splitting, or accepting and paying fees for settlement referrals. Importantly, RESPA also prohibits the receiving of fees for services not actually performed. 12 USC § 2607. Violation of this statute carries serious penalties: fines of up to $10,000.00, imprisonment, joint and several liability for treble damages, and court costs and attorney fees. Id.

73.     Defendants' conduct also violates the Idaho Consumer Protection Act, I.C. § 48-601 et seq., in that Defendants seek to maintain an exclusive listing for undeveloped lots in the subdivisions, to limit the number of builders who can build in the subdivisions, and to not allow the sale of lots without also requiring a commission on the houses to be built on the lots,

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL PURSUANT TO FED. R. CIV. P. 38(b) – 18

which efforts constitute the advertising of goods or services with intent not to sell them as

advertised as well as the engagement in an act or practice which is otherwise misleading, false,

and/or deceptive to the consumer.

74.     Defendants' actions, in addition to being regulated by both federal and state

statutes, likewise are subject to the National Association of Realtors Code of Ethics. There are

several key duties associated with the Code:

> The term REALTOR has come to connote competency, fairness, and integrity resulting from adherence to a lofty ideal of moral conduct in business relations. No inducement of profit and no instruction from clients ever can justify departure from this ideal. *Excerpt from Preamble*

> When serving a buyer, seller, landlord, tenant, or other party in a non-agency capacity, REALTORS remain obligated to treat all parties honestly. *Excerpt from Article 1 of the Code of Ethics and Standards of Practice of the National Association of Realtors dated January 1, 2005*

> REALTORS may represent the seller/landlord and buyer/tenant in the same transaction only after full disclosure to and with informed consent of both parties. *Excerpt from Standard of Practice 1-5 of the Code of Ethics and Standards of Practice of the National Association of Realtors dated January 1, 2005*

> REALTORS shall avoid exaggeration, misrepresentation, or concealment of pertinent facts relating to the property or the transaction. *Excerpt from Article 2 of the Code of Ethics and Standards of Practice of the National Association of Realtors dated January 1, 2005*

> In a transaction, REALTORS shall not accept compensation from more than one party, even if permitted by law, without disclosure to all parties and the informed consent of the REALTOR's client or clients. *Excerpt from Article 7 of the Code of Ethics and Standards of Practice of the National Association of Realtors dated January 1, 2005*

## COUNT I:   VIOLATION OF THE SHERMAN ACT § 1
### (Contract, Conspiracy, Combination, and Agreement in Restraint of Trade that is *Per Se* Unlawful)

75.   Plaintiffs reallege, and hereby incorporate by reference, all the foregoing allegations as if fully stated herein.

76.   Defendants and their officers and/or agents, by means of their actions, entered into a contract, combination, or conspiracy specifically intended to allow them to maintain an exclusive listing for undeveloped lots in the subdivisions and thereby (1) limit the number of builders who could build, (2) not allow the sale of lots without a commission on the house to be built on the lot, and (3) tie services on the construction and sale of the house to the services for sale of a lot.

77.   Said actions of Defendants restrain trade by limiting competition from real estate brokers who, but for the actions of Defendants, could charge a commission for the sale of an undeveloped lot independent of a commission on the sale of a house.  This denies consumers the opportunity for lower prices and the ability to select, if desired, a broker who would not charge commissions on the to-be-built house.  Said actions of Defendants restrain trade by also limiting competition from builders who, but for the actions of Defendants, could build houses in the subdivisions.  Defendants, by virtue of their actions, including the exclusive listing agreements, had sufficient economic power with regard to the sale of undeveloped lots to require the payment of commissions on the to-be-constructed houses.

78.   Said actions of Defendants were, and are, part of and affected the commerce of the United States.  They have a substantial effect on interstate commerce.

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL PURSUANT TO FED. R. CIV. P. 38(b) – 20

79.     Said actions of Defendants are *per se* violations of the Sherman Antitrust Act based on the illegal tying of broker services for the listing and building of the house to the services of the broker for the listing and sale of the undeveloped lot.

80.     The actions of Defendants, along with the other unknown persons, also constitute an illegal price fixing scheme by which the prices of homes have been improperly increased by up to six percent (6%). Finally, the actions of Defendants constitute an illegal agreement to limit competition and production by restricting the homebuilders who could build in the subdivision.

81.     The actions of Defendants constitute a *per se* violation of § 1 of the Sherman Antitrust Act.

## COUNT II:   VIOLATION OF THE SHERMAN ACT § 2
### (Attempt to Monopolize)

82.     Plaintiffs reallege, and hereby incorporate by reference, all the foregoing allegations as if fully stated herein.

83.     By arranging and maintaining their exclusive listing authority and using such authority to limit the number of builders, as well as refusing to sell lots without charging a commission on the home to be built on the lot, the Defendants, through their officers and agents, acting alone and/or in concert with others, established and maintained a monopoly position with regard to brokerage services for the sale of lots and homes in the subdivisions.

84.     As a result of Defendants' monopolization of the market, Defendants were able to, and did, inflate the cost of housing in the subdivisions by a margin of up to six percent (6%).

85.     By virtue of their market power and actions, Defendants were able to illegally tie their services and charge a commission on the price of the house(s) to their services for the sale of undeveloped lot(s).

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 21

86.    By virtue of their market power and actions, Defendants forced buyers in the subdivisions to pay for unwanted services by charging a commission that reflected the cost of the house as well as the commission on the undeveloped lot.

87.    By virtue of their market power and actions, Defendants likewise deprived buyers of their right to use a builder of their choice.

88.    The effect of Defendants' actions was to foreclose a substantial amount of interstate commerce.

89.    The actions of Defendants constitute a *per se* violation of Section 2 of the Sherman Act.

### COUNT III: VIOLATION OF IDAHO CODE § 48-101 et seq.

90.    Plaintiffs reallege, and hereby incorporate by reference, all the foregoing allegations as if fully stated herein.

91.    Defendants entered into a contract, combination, or conspiracy which was designed to maintain an exclusive listing for undeveloped lots in the subdivisions, to limit the number of builders who could build in the subdivisions, and to not allow the sale of lots without also requiring a commission on the houses to be built on the lots.

92.    Said actions of Defendants also further restrained trade by limiting competition from real estate brokers who, but for the action of Defendants, could have sold undeveloped lots and charged a commission based on the price of the lot without a commission on the sale of a house, thus benefiting buyers with lower prices and the ability to select a broker who would not charge a commission on the house.

93.    Said actions of Defendants also deprived buyers of their right to use a builder of their choice.

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 22

94.     Said actions of Defendants were part of and affected the commerce of the United States and the State of Idaho. They had a substantial effect on interstate commerce.

95.     Said actions of Defendants are *per se* violations of Idaho Code based on the illegal tying of broker services for the building of the house to the services of the broker for the sale of the lot. The actions of Defendants also constitute a price fixing scheme by which the prices of homes were increased by up to six percent (6%). Finally, the actions of Defendants constitute an illegal agreement to limit competition and production by restricting the homebuilders who could build in the subdivision to only those who agreed to include a commission on the sale of the house. All of these actions unreasonably restrained trade.

96.     By arranging and maintaining its exclusive listing authority and using such authority to limit builders and refusing to sell lots without charging a commission on the home to be built on the lot, Defendants, acting alone and/or in concert with others, established and maintained a monopoly position with regard to brokerage services and the sale of lots and homes in the subdivisions.

97.     As a result of Defendants' monopolization of the market, Defendants were able to, and did, inflate the cost of housing by a margin of up to six percent (6%).

98.     By virtue of their market power and actions, Defendants were able to tie their services and a commission on the price of the houses to their services and a commission on the undeveloped lots.

99.     By virtue of their market power and actions, Defendants forced buyers in the subdivisions to pay for unwanted services.

100.    The effect of Defendants' actions was to foreclose a substantial amount of interstate commerce and to unreasonably restrain trade, all in violation of Idaho law.

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL PURSUANT TO FED. R. CIV. P. 38(b) – 23

**COUNT IV:  Violation of the Idaho Consumer Protection Act, I.C. § 48-601 *et seq.***

101.    Plaintiffs reallege, and hereby incorporate by reference, all the foregoing allegations as if fully stated herein.

102.    Defendants entered into a contract, combination, or conspiracy which was designed to maintain an exclusive listing for undeveloped lots in its subdivisions, to limit the number of builders who could build in the subdivisions, and to not allow the sale of lots without also requiring a commission on the houses to be built on the lots.

103.    The conduct of the Defendants constitute unlawful activity under the Idaho Consumer Protection Act, I.C. § 48-601 *et seq.*, including, but not limited to, the advertising of goods or services with intent not to sell them as advertised and engaging in any act or practice which is otherwise misleading, false, and/or deceptive to the consumer.

104.    As a direct and proximate result of the Defendants' misleading, false, and/or deceptive conduct, Plaintiffs have been damaged in an amount to be proven at trial but which damages should include costs and reasonable attorney's fees incidental thereto.

**COUNT V:  VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES
ACT**

105.    Plaintiffs reallege, and hereby incorporate by reference, all the foregoing allegations as if fully stated herein.

106.    Defendants failed to disclose and misrepresented to Plaintiffs the true cost of real estate settlement services in that the commissions being charged were based on the price of the house and lot and not just the undeveloped lot alone.

107.    Defendants also failed to perform any services sufficient to allow it to charge commissions for the construction of the house on the undeveloped lots.

108.    Defendants, through their actions as alleged above, have thus violated the Real
Estate Procedures Act by failing to disclose to Plaintiffs the true and accurate real estate
settlement costs, specifically the amount of commissions, how the commissions were calculated
and charged, and by accepting fees for services not actually performed.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby respectfully demand a trial by jury on all issues raised by the pleadings
pursuant to 38(b) of the Federal Rules of Civil Procedure.

### ATTORNEY FEES

Plaintiffs have been required to retain the services of counsel to represent them herein.
These Plaintiffs are entitled to recover reasonable costs and attorney fees from Defendants
pursuant to the foregoing authorities stated and as may otherwise be allowed by law.

### PRAYER

WHEREFORE Plaintiffs pray for relief as follows:

1.    That the Court order, adjudge, decree, and declare that Defendants, and/or others
acting in concert with Defendants, have violated § 1 of the Sherman Act by illegally tying their
services as to the construction of a house to their services as to the sale of the lot.

2.    That the Court order, adjudge, decree, and declare that Defendants, and/or others
acting in concert with Defendants, have violated § 1 of the Sherman Act by illegally denying
buyers of their right to use potential builders of their choice by limiting the builders allowed to
build in the subdivisions and limited the opportunity for other brokers.

3.    That the Court order, adjudge, decree, and declare that Defendants, and/or others
acting in concert with Defendants, have violated § 2 of the Sherman Act by creating and using
their monopoly power to illegally tie their services as to the construction of a house to their

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 25

services as to the sale of the lot and by illegally limiting the builders allowed to build in the subdivisions.

4.     That the Court order, adjudge, decree, and declare that the Defendants' actions represent a conflict of interest and violate the National Association of Realtors Code of Ethics.

5.     That the Court order, adjudge, decree, and declare that the actions of the Defendants constitute unfair trade practices and illegally restrain trade pursuant to § 1 of the Sherman Act, § 2 of the Sherman Act, and I.C. § 48-101 *et seq.*

6.     That the Court order, adjudge, decree, and declare that the Defendants' actions violate the Real Estate Settlement Procedures Act.

7.     That the Court order, adjudge, decree, and declare that the actions of the Defendants violated Idaho Consumer Protection Act, I.C. § 48-601, *et seq.*

8.     That the Court award Plaintiffs and members of the class their damages, trebled as provided by the foregoing law, including the disgorgement of illegal profits, and ,as appropriate, any and all assets acquired by virtue of the illegal profits and setting aside any transfer or conveyance of such illegal profits.

9.     That the Court award Plaintiffs and members of the class their costs and attorney fees.

10.     That the Court enjoin Defendants from engaging in such illegal conduct in the future; and

11.     That the Court order such other relief as is just and equitable.

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 26

DATED this __18__ day of August 2005.

> BRUCE M. SMITH
> MOORE SMITH BUXTON & TURCKE, CHARTERED
>
> PHILIP H. GORDON
> GORDON LAW OFFICE
>
> BLACKBURN & JONES LLP
>
>
> By _____
>     BRUCE C. JONES
>     DANIEL LORAS GLYNN

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on this __16__ day of August 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and sent a true and correct copy of the foregoing by first-class mail, postage prepaid, and addressed to; by fax transmission to; by overnight delivery to; or by personally delivering to or leaving with a person in charge of the office as indicated below:

Anthony J. Bohner             [ ✓ ] U.S. Mail
P.O. Box 16789                [   ] Fax: 376-0998
Boise, ID 83715             [   ] Overnight Delivery
*Attorney for Defendant Aspen Realty Inc.*    [   ] Messenger Delivery

_____
Bruce C. Jones

SECOND AMENDED COMPLAINT (Class Action) AND DEMAND FOR JURY TRIAL
PURSUANT TO FED. R. CIV. P. 38(b) – 27